By the Court,

Cowes', J.
The prisoner’s petition on which I allowed this writ, contained an intimation that his commitment to the jail of the county of Niagara had not been regular ; but that ground is now abandoned. The sheriff returns an indictment for murder, found by a grand jury of that county against the prisoner, on which he appears to have been arraigned at the court of oyer and terminer holden in the same county. It further appears that he pleaded not guilty, and was duly committed for trial. The indictment charges, in the usual form, the murder of Amos Durfee by the prisoner, on a certain day, and at a certain town within the county.
These facts, although officially returned by the sheriff, were, by a provision in the habeas corpus act, 2 R. S. 471, 2d. ed. § 50, open to a denial *434 by affidavit, or the allegation of any fact to show that the imprisonment or detention was unlawful. In such case, the same section requires this court to proceed in a summary way to hear allegations and proofs in support of the imprisonment or detention, and dispose of the party as the justice of the case may require. Under color of complying with this provision, which is of recent introduction, the prisoner, not denying the jurisdiction of the court over the crime as charged in the indictment, or the regularity of the commitment, has interposed an affidavit stating certain extrinsic facts. One is, that he was absent, and did not at all participate in the alleged offence ; the other, that if present and acting,- it was in the necessary defence or protection of his country against a treasonable insurrection, of which Durfee was acting in aid at the time.
[ *568 ] ^Taking these facts to be mere matters of evidence upon the issue of not guilty, and, of themselves, they are clearly nothing more, I am of opinion that they cannot be made available on habeas corpus even as on argument for letting the prisoner to bail, much less for ordering his unqualified discharge. That this would be so on all the authorities previous to the Revised Statutes, his counsel do not deny. The rule of the case is thus laid down in the British books: “ A man charged with murder by the verdict of a coroner’s inquest may be admitted to bail; though not after the finding of an indictment by the grand jury.” 1 Chit. Cr. L. 129, Am. ed. of 1836. Petersd. on Bail, 521, S. P. It has never, as we are aware, been departed from in practice, under the English habeas corpus act. Lord Chief Justice Raymond said, in Rex v. Dalton, 2 Str. 911, that he Would bail though a coroner’s inquest had found the crime to be murder; and the distinction was between the coroner’s inquest, where the court can look into the depositions, and an indictment where the evidence is secret. Lord Mohun's case, 1 Salk. 104, S. P. This reason is adopted by Chitty, at the page of his Cr. Law before cited ; and by Petersd. on Bail, London ed. 1835,p. 521. It was also recognized by Sutherland, J. of this court, in 1825. Tayloe’s case, 5 Cowen’s Rep. 56. He says, “ the indictment must be taken as conclusive upon the degree of the crime.”
The depositions heretofore taken in the cause being thus cut off, there are no means of inquiry left us on this motion, by which we can say whether a murder was in fact committed, or whether the charge would probably be mitigated on the trial to a very doubtful case of manslaughter, or to a homicide in defence, or whether all participation might be disproved by showing a clear alibi. Nothing is better settled, on English authority, than that on habeas corpus, the examination as to guilt or innocence' cannot, under any circumstances, extend beyond the depositions or proofs upon which the prisoner was committed. This would be so, even on habeas corpus before an indictment found, however loosely the charge might be expressed in the war *435 rant of commitment. Ohitty, at the page before cited, says, “ It is in *fact to the depositions alone that the court will look for their [ *569 ] direction: where a felony is positively charged, they will refuse to bail, though an alibi be supported by the strongest evidence.” He cites Rex v. Greenwood, 2 Str. 1138, a case of robbery, and eight credible witnesses making affidavit that the prisoner was at another place at the time when the robbery was sworn to have been committed; yet, adds the report, the court refused to admit him to bail, but ordered him to remain till the assizes. Here the crime is clearly proved by the depositions which have been read on the side of the people, while, instead of eight witnesses to an alibi, we have the solitary affidavit of the prisoner. In Rex v. Acton, 2 Str. 851, the prisoner had been tried for murder and acquitted : afterwards a single justice of the peace issued a warrant charging him with murder, on circumstances similar to those upon which he had been acquitted, and he was again committed. On an offer to show the former acquittal in the clearest manner, the court refused to hear the proof. On the authority of this case, Mr. Ohitty, at the page just cited, lays down the rule that the court will not look into extrinsic evidence at all. He states a case wherein the same question came up in respect to on inferior crime: receiving stolen goods with a guilty knowledge. The prisoner’s affidavit denied his knowledge: yet the court refused to bail, saying the fact of knowledge was triable by a jury only. They added, it would be of dangerous consequence to allow such proceedings, as it might induce prisoners generally to lay their case before the court. Petersd. on Bail, 522, refers to Chitty, who cites Cas. K. B. 96 . This book, eo nomine, does not appear now to be extant; and 12 Mod. the only reference I am aware of, which, among the English quotations, is synonymous with Ohitty*s, does not appear to contain the caso stated by him.* But it accords with many others in circumstance ; and tbo reason given is almost too plain to demand any direct authority. To hear defensive matter through ex parte affidavits as a ground for bailing the prisoner, would be to trench *on the office of the jury; for in the esse of high crimes, bail [ *570 ] would be equivalent to an acquittal. Accordingly, the rule as laid down in Horner's case, 1 Leach, 270, 4th ed. London, 1815, is in effect the same with that stated by Ghitty, The prisoner had been committed under a charge of defrauding and robbing a man of his money by false pretences. It was insisted that the facts stated in the depositions for the King made out a misdemeanor; and that the prisoner was therefore entitled to bail. But the transaction by which the money was obtained admitted of one construction which might make it a felonious taking. The court said, “ In cases of this kind the course has always been to leave it to the jury to determine quo animo the money was obtained. In such a case the court never *436 form any judgment whether the facts amount to a felony or not; but merely whether enough is charged to justify the detainer of the prisoner, and put him upon his trial.”
The cases I have noticed were, in several respects, stronger for the prisoners, than the case before us. They were mostly founded on charges of a character much less serious than murder. They were all before indictment found: some of them presented a state of things on which it was plainly impossible to convict; and last, though not least, they were mere applications for bail, a thing which McLeod does not ask for. He demands an absolute discharge, on grounds upon which, according to the laws of England, he would not even be entitled to bail. The law of England formed in this respect the law of Hew-York, until our new habeas corpus act took effect.
It becomes necessary next to inquire whether the new.statute has worked any enlargement of our powers beyond what we have seen they were up to the time when it passed. The 2 R. S. 469, 2d ed. § 40, 41, require us to examine the facts contained in the return, and into the cause of the confinement of the prisoner; and if no legal cause be shown for it, or for its continuation, we are to discharge him. That here is legal cause, vi z: an indictment for murder, and an order of commitment, we have seen is not denied. By the forty-fifth section, page 470, if it appear that the [ *571 ] party has *been legally committed for any criminal offence, we are required to let him to bail, if the case be bailable. But so far we have no -direction as to what case shall be considered bailable. We are left under the restraints which I have noticed as existing before the statute. Hot one of them is removed by it.
Then comes section fifty, page 471, which is relied on by the prisoner’s counsel. I briefly noticed this in proposing the question to be considered. But the prisoner is entitled to the benefit of it entire. The words are, that “ the party brought before -such court or officer, on the return of any writ of habeas corpus, may deny any of the material facts set forth in the return, or allege any fact to show either that his imprisonment or detention is unlawful, or that he is entitled to his discharge, which allegations or denials shall be on oath; and thereupon such court or oiticer shall proceed in a summary way, to hear such allegations and proofs as may be produced in support of such imprisonment or detention, or against the same, and to dispose of such party as the justice of the case may require.” Under this statute, the prisoner’s counsel claim the right of going behind the indictment, and proving that he is not guilty by affidavit, as he may by oral testimony before the jury. We have already shown the absurdity of such a proposition in practice, and its consequent repudiation by the English criminal courts. And we are not disposed to admit its adoption by our legislature, without clear words or necessary construction.
*437 We think its object entirely plain without a resort to the rules of construction. Its words are satisfied by being limited to the lawfulness of the authority under which the prisoner is detained, without being extended to the force of the evidence upon which the authority was exerted, or which it may be in the prisoner’s power to adduce at the trial. This, if necessary, is rendered still more plain by considering the evil which the statute was intended to remedy. At common law, it was doubtful whether the prisoner could question the truth of the return or overcome it by showing extrinsic matter, upon the point of the authority to imprison. The statute was passed to obviate the oppression that might sometimes ‘'arise from [ *572 ] the necessity of holding a return to be final and conclusive, which is false in fact, or if true, depending for its validity on the act of a magistrate or court which can be shown by proofs aliunde to have been destitute of jurisdiction. Watson’s case, 9 Adolph, and Ellis, 731. 3 R. S. 784, 5, 2d ed. App. note. An innocent man may be, and sometimes unfortunately is imprisoned. Yet his imprisonment is no less lawful than if he were guilty. He must await his trial before a jury. There are various cases in which the enactment, alowing proof extrinsic to the return, may have effect without supposing it applicable here. It must, I apprehend, for the most part, apply to the cases where the original commitment was lawful; but in consequence of the happening of some subsequent event, the party has become entitled to his discharge, as if he be committed till he pay a fine, ■ which he has paid accordingly, and the return states the commitment only; so after conviction he may allege a pardon, or that the judgment under which he was imprisoned has been reversed. Nor is it necessary to inquire how far we might be entitled to go, were the prisoner in custody, on the mere examination and warrant of a committing magistrate.
But it is said we have power to direct the entry of a nolle prosequi, and it is our duty to look into the merits of the case with a view to decide whether it be a proper one for the exercise of that power. This proposition is also put upon a new section of the Revised Statutes, which most clearly gives no color for the suggestion. At common law the attorney general alone possessed this power; and might, under such precautions as he felt it his duty to adopt, discontinue a criminal prosecution in that form at any time before verdict. The power and practice under it are laid down in 1 Chit. Cr. Law, 478, edition before cited. It probably exists unimpaired in the attorney general to this day ; and it has been by several statutes delegated to district attorneys, who now represent the attorney general in nearly every thing pertaining to indictments and other criminal proceedings local to their respective counties. The legislature finding the power in so many hands, and fearing its abuse, by the 2 R. S. 609, 2d ed. § 54, provided that it should not thereafter be lawful for *any district attorney to enter a [ *573 ] *438 nolle prosequi upon any indictment, or in any other way discontinue or abandon the same without leave of the court having jurisdiction to try the of" fence charged. This provision, the prisoner’s counsel contended, so enlarged our powers that we might arbitrarily interfere on the prisoner’s affidavit and other proofs verifying his innocence, or even on grounds of national policy, as where the prosecution would be likely to affect our foreign relations unfavorably ;vand that, too, in despite of the attorney general and district attorney. Conceded as it was, that before the Revised Statutes we had no right to give such direction, the argument seeks to draw from the statute giving us a veto against the nolle prosequi a positive power to compels entry. Even if we had such power, the argument would be quite extraordinary. It demands that we should finally dispose of an indictment for mupder on the sort of evidence by which we are guided upon a motion to set aside default or change a venue. In any view, this question belongs primarily to the executive department of the government.
I shall have occasion to inquire hereafter whether these views should not be regarded as a final answer to this application. That will depend on the question, whether the facts stated on the. part of .the prisoner, supposing them to be admissible at all, are proper for the consideration of the jury only ; or whether, as counsel have insisted with great zeal, they are such as to divest our criminal courts of all jurisdiction either over the subject matter or person of the prisoner. We should, as we thought at the close of the argument, have felt ourselves entirely satisfied to dispose of the case on the first question, without looking any farther into the nature of the transaction out of which this indictment has arisen. But as counsel made the question of jurisdiction their main topic, we preferred to reserve the case, and have looked into it as far as possible during a very short vacation, consistently with other pressing judicial avocations.
Want of jurisdiction has not been put on the ground that McLeod was a foreigner. An alien, in whatever manner he may have entered [ *574 ] our territory, is, if he commit a crime *while here, amenable to our criminal law. Lord Mansfield, in Cambell v. Hall, Cowp. 208 ; Vattel, B. 2, ch. 8, § 101—2; Story’s Confl. of L. 518, 2d ed. Nay, says Locke, though he were an Indian, and never heard of our laws. On Civ. Gov. B. 2, ch. 2, § 9.
But it is said,' his case belongs exclusively to the forum of nations, by which counsel mean the diplomatic power of the United States and England, or in the event of their disagreement, the battle-field. I have already ad-« mitted that counsel may, under the 50th section of the habeas corpus act, allege and prove a want of jurisdiction. To show this the affidavit of McLeod is produced, from which the inference is sought to be raised, that the Niagara frontier was in a state of war against the contiguous province of *439 Upper Canada ; that the homicide was committed by McLeod, if at all, as one of a military invading expedition, set on foot by the Canadian authorr ties to destroy the boat- Caroline ; that he was a British subject. That the expedition crossed our boundary, sought the Caroline at her moorings in Schlosser, and there set fire to and burned her, and killed Durfee, one of our citizens, as it was lawful to do in time of war.
We need not stay to examine the. conclusion, viz: a want of jurisdiction, if the premises be untrue. To warrant the destruction of property or the taking of life on the ground of public war, it must be what is called laivful war, by the law of nations, a thing which can never exist without the actual concurrence of the war making power. This on the part of the United states, is congress ; on the part of England, the Queen. A state of peace and the continuance of treaties must be presumed by all courts of justice till the contrary be shown ; and this is presumptio juris et de jure, until the national power of the country in which such courts sit, officially declares the contrary. A learned English writer on the law of nations, makes this remark ; (1 Ward’s L. of Nations, 294.) “ Although I am aware that there is a great authority for the contrary opinion, yet it is upon the whole settled, that no private hostilities, however general, or however just, will constitute what is called a legitimate and public state of war. So far indeed has my Lord Coke carried *this point, that he holds, [ *575 ] if all the subjects of a king of England were to make war on another country, in league with it, but without the assent of the king, there would still be no breach of the league between the two countries.” 1 Bl. Com. 267, S. P. Again, in Blackburn v. Thompson, 15 East, 81, 90, Lord Ellenborough, Ch. J. delivering the opinion of the court of King’s Bench, said, “ I agree with the master of the rolls in the case of the Pelican, 1 Edw. Adam. Rep. Append. D., that it belongs to the government, of the country to determine in what relation of peace or war any other country stands towards it; and that it would be unsafe for courts of justice to take upon them without that authority, to decide upon those relations. But when the crown has decided upon the relation of peace or war in which another country stands to this, there is an end of the question.” 3 Camp. 66, 7, S. C. and S. P.
So far were the two governments of England and the United States from being in a state of war when the Caroline was destroyed, that both were struggling to avoid such a turn of the excitement then prevailing on the frontier, as might furnish the least occasion for war. Both had long maintained the relations of national amity; and have done so ever since under an actual treaty. So far from England fitting out a warlike expedition against the United States, or any public body, she utterly disavows any such object; while on our side we have inflicted legal punishment on *440 the leaders of the expedition of which Durfee made a part, on the ground that England was then at peace with us. Whatever hostile acts she did, were aimed exclusively at private offenders; and if there was a war in any sense, the parties were England on one side, and her rebel subjects aided by certain citizens of our own, acting in their private capacities and contrary to the wishes of this government, on the other.
In speaking of public war, I mean to include, all national wars, whether general or partial, whether publicly declared or carried on by commissions, such as letters of marque, military orders or any other authority, emanating from the executive power of one country, and directed against the power of another; whether the directions relate to reprisals, the seiges [ *576 ] *of towns, the capture or destruction of private or public ships, or the persons or property of private men belonging to the adverse nation. I mean to exclude all hostility of any kind, hot having for its avowed object, the exercise of some influence or control over .the adverse nation as such. I deny that public war in this sense can be made out by affidavit, or by any other medium of proof, than the denunciation of war by one or both of the two nations who are parties to it.
There are but three sorts of war, public, private, and mixed. Grot. B. 1, ch. 3, § 1. Private war is unknown in civil society, except where it is lawfully exerted by way of defence between private persons. To constitute ■ a public war, at least two nations are essential parties, in their corporate capacities. Mixed war can be carried on only between a nation on one side and private individuals on the other. There is no fourth kind. Grot, ut Supra.'
The right of one nation, or any of its citizens to invade another, or ., enter it and do any harm to its property or citizens, does not arise till public war be lawfully denounced in some form. It does not arise where one ■ ■ nation has a quarrel with private persons being within the territory of another. Whether there be any exception to this rule, I shall hereafter inquire.
Much was said in argument on the assumption that the state of hostilities on the frontier amounted to unsolemn war. In supposing this to be so,, counsel come back to the very error which they repudiated in more general terms. A war is none the less public or national because it is unsolemn. All national wars are of two kinds, and two only; war by public declaration, or war denounced without such declaration. The first is called solemn or perfect war, because it is general, extending to all the inhabitants of both nations. In its legal consequences it sanctions indiscriminate hostility on. both sides, whether by way of invasion or defence. The second is called - unsolemn or imperfect war, simply because it is not made upon general, but special declaration. The ordinary instance is a commission of reprisal, limiting the action of the nation plaintiff, to particular objects and purposes *441 against the nation defendant. It supposes a partial grievance, '■"which can be redressed by a corresponding remedy or action; [ *577 ] and does not authorize hostility beyond the scope of the special authority conferred. Such are several of the instances I have just now mentioned. But they are no less in stances of public war. The attack on Copenhagen was mentioned on the argument as an instance of unsolemn war. So indeed it was. The British admiral had a deputation from the war-making power of England to act against the war-making power of . Denmark ; to demand the surrender of the Danish fleet, and, on refusal, to destroy public or private property, or take life—not as a punishment of private offenders, but to coerce the nation. Why was the attack made ? Because Denmark would not surrender her navy voluntarily; and there was danger that France would take it either by force or under collusion on the side of Denmark. Those who were in arms on the side of Denmark, acted not in their own right, but as agents of the nation to which they wereflsubject. Before the remotest analogy can be seen between that case and the one at bar, the United States must be brought in and made defendant in their corporate capacity. It will be seen, I trust, by this time, that the instance derogates not in the least from the distinction that runs through all the writers on the international law, viz. that to constitute either solemn or unsolemn war, the authority to act must emanate from the war-making power on one side, and be intended to influence that power on the other. Action under such a power is necessarily a collision between two nations; and answers to Grotius’ definition, viz: “ That is a public war which is made on each side by the authority of the civil power.” B. 1, ch. 3, § 1. At the fourth section, he divides this sort of war into solemn and unsolemn, of which latter he gives an instance in B. 3, ch. 2, § 2, N. 3. Vid. also 2 Ruth. ch. 9, § 9,10. The distinction has been followed to this day, though the legal character of unsolemn war has since been changed. “ Both,” says Rutherforth, “ are now lawful. The only real effect of a declaration of war is, that it makes the war a general one; whilst the imperfect sorts of war, such as reprisals, or acts of hostility, are partial or are confined to particular persons, or things, or places. In a solemn war, all the members of one nation act against the [ *578 J other under a general commission; whereas in public wars which are not solemn, those members of one nation who act against the other, act under particular commissions. Ruth. B. 2, ch. 9, § 18. Vattel, B. 3, ch. 15. And see this distinction well treated, 1 Hal. P. C. 162, 163.
Both sorts of war are lawful, because carried on under the authority of a power having, by the law of nations, a right to institute them. In any other war, no belligerent rights can be acquired. All captures, all destruction of property must be illegal, and the taking of life a crime. Short of *442 this, war cannot be carried into an enemy’s country, for the simple reason that there is no war to carry there, and no enemy against whom it can be exerted. The nation denouncing war must be explicit. “ This makes it,” says "Vattel, “formal, and so lawful. But nothing of this kind,” says he, i£is the case in an informal, illegitimate war, which is more properly called depredation. A nation attacked by enemies, without the sanction of a public war, is not under any obligation to observe towards them the rules of formal warfare. She may treat them as robbers.” Vattel, B. 3, ch. 4, § 68.‘ “ Such unauthorized volunteers in violence,” says Blackstone, “ are not ranked among open enemies, but are treated like pirates and robbers.” 3 Bl. Com. 267.
It was accordingly conceded, in argument, that the Canadian provincial authorities had no inherent power to institute a public war. Vid. 2 Ruth, ch. 9 § 9, We were, however, referred to Burlamaqui, Pt. 4, ch. 3, § 18, 19, to show that those authorities might do so on the presumption that their sovereign would approve the step ; and that such approbation would reflect back, and render the war lawful from the beginning. On the assumption that this indirect mode of instituting war had actually been resorted to, counsel again bring themselves back to the fundamental error which led to this application. No one would deny that if the affair in question can be tortured into war between this nation and England, the United States might take possession of McLeod as a prisoner of war. In such a [ *57 9 ] case, there would have been *no need of this motion. But admitting the rule of Burlamaqui, and that counsel might, by the aid of England, get up an ex post facto war for the benefit of McLeod, this cannot be done by an equivoque ; and especially not in contradiction to the language of England herself. Neither the provincial authorities? nor the sovereign power of either country have, to this day, characterized the transaction as a public war, actual or constructive. They never thought of its being one or the other. Both have spoken of it as a transaction public on one side, to be sure, but both claimed to hold fast the relations of peace. Counsel seem to have taken it for granted that a nation can do no public forcible wrong without being at war, even though it deny all action as a belligerent. At this rate every illegal order to search a ship, or enter on a disputed territory, or for the recaption of national property even from an individual, if either be done vi et armis, and work wrong to another nation or any of its subjects, would be public war, necessarily so, though the actor should deny all purpose of war. Were such a rule once admitted, England and the United States can scarcely be said to have been at peace since the revolution which made them two nations. My endeavor has been to show that on the question of war or peace there is a quo animo of nations, by which we are bound.
*443 To prevent all misunderstanding in the progress of the argument, it is proper to observe farther, that an act of jurisdiction exerted by inferior magistrates, civil or military, for the arrest or punishment of individuals, is mot public war, of either kind. So long as the act is kept within legal compass, though its exertion be violent, where for instance, the object is to suppress a riot, quell an insurrection, or repel the hostile incursions of individuals, it is, though sustained by a soldiery in arms, only one mode of enforcing the criminal law. It is like calling out the militia as a posse comitatus to aid a sheriff who is resisted in the execution of process. Force becomes lawful where the laws are set at defiance. We see this in frequent resort to soldiers of the regular army by the English, in cases of dangerous riots. Vid. Ruth. B. 2,, ch. 9. § 9. Such a state of things, therefore, confers no right *to act offensively against individuals who [ *580 ] reside or sojourn in the neighboring territory. Should they be pursued and arrested, or killed, the act would be a naked usurpation of authority, like the sheriff of one county going into another to execute process. u If,” says Rutherforth, B. 2, ch. 9, § 9,“ the magistrate, in any instance, use even the force with which he is entrusted, in any other manner, or for any other purpose than is warranted by his appointment, this, as it is his own act, and not the act of the public, cannot be called public war.”
Sensible that all pretence of belligerent right was wanting, it was, therefore, in the first view, as a lawful act of magistracy, that the case was sought to be put by Mr. Fox, both in his letter to Mr Forsyth and Mr. Webster. I take the words of his last letter, written after the question had been deliberately considered by bis government: “ The grounds upon which the British government make this demand” (the surrender of McLeod,) 66 are these: that the transaction on account of which Mr. McLeod has been arrested, and is to be put upon his trial, was a transaction of a public character, planned and executed by persons duly empowered by her majesty’s colonial authority, to take any steps and do any acts which might be necessary for the defence of her majesty’s territories, and for the protection of her majesty’s subjects ; and that consequently, those subjects of her majesty who engaged in that transaction were performing an act of public duty, for which they cannot be made personally and individually answerable to the laws and tribunals of any foreign country.” In the same letter he re-states the opinion of his government, that “ it was a justifiable employment of force for the purpose of defending the British territory from the unprovoked attack of a band of British rebels and American pirates.”
If this view of the transaction can be sustained, it was lawful ab initio. It required no royal recognition to render it national. It came within the power which the Canadian authorities held from England to act in her place and stead. So long as they confined themselves within the territorial line *444 of Canada, they were doing no more than the nature of their con- [ *581 ] nection with England required; sustaining that absolute *and exclusive- jurisdiction to which she is entitled in common with every other nation. Whether* they had power without pretence of being engaged in a war with the United States, or could derive power from England, to fit out an expedition, cross the line and seize or destroy the property and persons of our citizens in this country, and whether anjr one acting under such an assumption of power, can be protected, is quite a different question.
One decisive test would be furnished- by admitting that Durfee had committed a crime against England, for which he was liable to arrest and trial in Canada. None would pretend that any warrant from the English nation could be used to protect one of her officers from an action of false imprisonment, if he had merely arrested the offender on this side the line. No one would pretend that a military order and the addition of the Queen’s soldiers and sailors would, in such case, strengthen a plea of justification ; nor would the subsequent approval of the nation. This would have no greater effect than the original authority; accordingly it was not pretended on the argument that England had any right whatever to send and arrest Durfee as a fugitive from justice. The pretence that she had any such right would have been too absurd to bear the name of argument. Nor is it pretended that her magistrates, civil or military, had any power within our territory to seize and bind him over to keep the peace towards England or her subjects. “ We cannot,” says Vattel, B. 2, ch. 7, § 93, “ enter the territory of a nation in pursuit of a criminal, and take him from thence. This is what is called a violation of territory; and there is nothing more generally acknowledged as an injury that ought to be repelled by every state that would not suffer itself to be oppressed.” The rule is too familiar, even as between the states of this confederacy, to require that it should be insisted on at large.
But the civil war which England was prosecuting against various individuals, was insisted on as a ground of protection ; and I am free to admit that the strongest possible color for the extraordinary right claimed, is to be derived from taking the United States to stand in the attitude of a [ *582 ] neutral *nation with respect to two parties engaged in actual war England on one side, and Van Rensselaer, Durfee and their associated assailants on the other. This is what Grotius calls mixed war, being, as he says, “ that which is made on one side by public authority, and on the other by mere private persons ; B. 1, ch. 3, § 1. Rutherforth retains the same distinction under the same name, in characterizing a contest between a nation as such and its external enemies coming in the form of pirates or robbers; associates, he says, who act together occasionally and are not united into civil society. Ruth. B. 2, ch. 9, § 9. The several invasions of *445 England by Perkin Warbeck, and Lord Heries, mentioned in 1 Hal. P. C. 164, the former of which is also noticed in Calvin’s case, 7 Co. Rep. 11 —12, are instances of such a war ; the books saying that in England, such offenders must be tried by martial law, for a reason which I shall hereafter consider. Let Durfee, then, be regarded as England’s enemy, who has, with Wells, the boat owner and his boat, ‘taken shelter in the neutral territory of the United States. Had England any right to follow him there ? Hone say the books, not even in the heat of contest, had he been an enemy pursued and flying for shelter across the line. 1 Kent's Com. 119—20. Independently of fresh pursuit, no writer on the law of nations ever ventured the assertion that one of two belligerents can lawfully do any hostile act against another upon neutral ground. If it be not a plain deduction from common sense, yet, on principles in which publicists universally agree, all rightful power to harm the person or property of any one dropped from the hands of McLeod and his associates the moment they entered a country with which their sovereign was at peace. Ho exception can be made consistently with national safety. Make it in favor of the subordinate civil authorities of a neighboring state, and your territoiy is open to its constables; in favor of their military, you let in its soldiery; in favor of its sovereign, and you are a slave. Allow him to talk of the acts and machinations of our citizens, and /send over his soldiers on the principle of protection, to burn the property or ' take the lives of the supposed offenders, and you give up to the midnight assault of *exasperated strangers the dwelling and life [ *583 ] 1 of every inhabitant on the frontier whom they may suspect of a disposition to aid their enemies. Hever since the treaty of 1783, had England, in time of peace with us, any more right to attack an enemy at Sehlosser, than would the French have at London in time of peace with England.
“ The full domain,” says Yattel, “ is necessarily a peculiar and executive right. The general domain of a nation is full and absolute, since there exists no authority upon earth by which it can be limited; it therefore excludes all right on the part of foreigners.” B. 2, ch. 7, § 79. The same writer defines the jurisdiction of courts within that domain. “ The sovreignty united to the domain, establishes the jurisdiction of the nation in ■ her territories. It is her province to exercise justice in all the places under her jurisdiction ; to take cognizance of the crimes committed, and the differences that arise in the country.” Id. § 84. “ It is unlawful,” says the same writer, “ to attack an enemy in a neutral country, or to commit in it any other act of hostility.” B. 3. ch. 7, § 132. “ A mere claim of territory,” says Sir William Scott, a British judge of admiralty, “ is undoubtedly very high; when the fact is established, it overrules every other consideration." In the Vrow Anna Catharina, 5 Rob. Adm. Rep. 20-1. And he refused to recognize a right of capturing an enemy’s ship within a *446 marine league of our coast. The Anna La Porte, Id. 332. “ We only exercise the rights of war in our own territory,” says Bynkershoek, “ or in the enemy’s,, or in a 'territory which belongs to no one.” Quest. Jur. Pub., B. 1, ch. 8. “ There is no exception,” says Chancellor Kent, “ to the rule 1 that every voluntary entrance into neutral territory with hostile purposes, is I absolutely unlawful.” 1 Kent’s Com. 119, 4th ed. “ The jurisdiction of courts,” says Marshall, C. J., “ is a branch of that which is possessed by the nation as an independent sovereign power. The jurisdiction of the nation within its own territory is necessarily exclusive and absolute. It is susceptible of no limitation not imposed by itself;' any restriction derived from an external source would imply a diminution of its sovereignty to the [ *584 ] extent of the Restriction, and an investment of that sovereignty to the same extent in that power which could impose such restriction.” The schr. Exchange v. McFadden et. al., 7 Cranch, 116, 136. That these are not rules of yesterday, but have formed a part of the acknowledged law of nations for nearly two thousand years, may be seen in Grotius, B. 3, ch. 4, § 8, N. 2. He says we may not kill or hurt an enemy in a country at peace with us. “ And this proceeds not from any privilege attached to their persons, but from the right of that prince in whose domains they are. For all civil societies may ordain that no violence be offered to any one in their- territories but by a proceeding in a judicial way, as we have proved out of Euripides—
‘ If you can charge these guests with an offence, Do it by law; forbear all violence.’
But in courts of justice the merit of the person is considered, and this promiscuous purpose of hurting each other ceases. Livy relates that seven Carthaginian gallies rode in a port belonging to Syphax, who, at that time, was at peace both with the Carthaginians and Romans ? and that Scipio came that way with two gallies. These might have been seized by the Carthaginians before they had entered the port, but being forced by a strong wind into the harbor, before the Carthaginians could weigh" anchor, they durst not assault them in the King’s haven.” Several more modern‘instances of a like character are stated by Molloy de Jur. Mar. B. 1, ch. 1, § 16. It is said to be a rule in the modern law of nations, that not only must the parties refrain from hostilities while in a neutral port; but should one set sail, the other must not till 24 hours after. Martens’ L. of Nations, B. 8, ch. 6, § 6, note. And a doctrine about as strong was laid down by Sir.Wm. Scott, in the case of the Twee Gebroeders, 3 Rob. Adm. Rep. 162.
To apply these authorities : The affidavit of McLeod suggests that Durfee had, on the day before he was killed, aided in transporting military stores to'Navy Island, and surmises that he intended to continue the practice. I *447 put it again that the war, if any, was by England against him and his associates : not against the United States. But *what [ *585 J right, I again ask, had she to pursue him into a territory at peace ? That she had none I have shown from her own judge sitting-in the forum of nations, from one of our judges sitting in the like forum, from authoritative publicists, and from all antiquity. I have shown that even punic faith felt itself bonnd to let an enemy go free whom it accidentally met on neutral ground. Within the territory of a nation at peace, all belligerent power, all belligerent right, is paralyzed. They have passed from the dominion of arms to that of law. “ No violence can be offered,” says Grrotius: “ but you must proceed in a judicial way.” The only offence against our law which Durfee had committed, was in setting on foot a hostile expedition against England with whom we are at peace. So far I admit he was guilty according to the suggestion in McLeod’s affidavit. He had made himself a principal in the aggression of McKenzie and others; for there are no accessories in misdemeanor. The courts were open. Why did not England prefer her complaint ? Was it competent for her to allege that our justice was too mild or too hardy, and therefore substitute the firebrand and musket. To admit such a right of interference on any ground or in any way, says Marshall, would be a proportional diminution of our own sovereignty, of which judicial power makes a part. “ The law of nations,” says Rutherforth, “ is not the only measure of what is right or wrong in the intercourse of nations with each other. Every nation has a right to determine by positive law, upon what occasions, for what purposes, and in what numbers foreigners shall bh allowed to come within its territories.” Ruth. B. 2, ch. 9 § 6 ; Vattel, B. 2, ch. 7, § 94. .
It follows from the authorities cited, that a right to carry on mixed war never extends into the territory of a nation at peace. It can be exercised on the high seas only, or in a territory which is vacant and belonging to nobody. It is in modern law confined mainly to the case of pirates. But even these cannot be arrested in the territory of a foreign nation at peace with the sovereign of the arresting ship. Molloy de Jur. Mar. B. 1, ch. 1, § 16.
*But admitting that England might protect a man against our [ *586 ] jurisdiction, by saying he did a public act under her authority, does it not behoove her at least to show that she has acted within the limits of her own jurisdiction, especially where she has prescribed them to herself?- Shall her declaration enure to deprive us of power where she is exceeding her own ? And this brings me to inquire whether the transaction in question be such as any national right so far examined can sanction. She puts herself, as we have seen, on the law of defence and necessity; and nothing is better defined nor more familiar in any system of jurispru *448 dence, than the juncture of circumstances which can alone tolerate the action of that law. A force which the defender has a right to resist must itself be within striking distance. It must be menacing, and apparently able to’’ inflict physical injury unless prevented by the resistance which he opposes. The rights of self-defence and the defence of others standing in certain relations to the defender, depend on the same ground, at least they are limited by the same principle. It will be sufficient, therefore, to inquire of the right so far as it is strictly personal. All writers concur in the language of Blackstone, 3 Com. 4—that, to warrant its exertion at all, the defender must be forcibly assaulted. He may then repel force by force? because he cannot say to what length of rapine or cruelty the outrage may be carried, unless it were admissible to oppose one violence with another. “ But,” he adds, “ care must be taken that the resistance does not exceed the bounds of mere defence and prevention; for then the defender would himself become the aggressor. The condition upon which the right is thus placed, and the limits to which its exercise is confined by this eminent writer, are enough of themselves, when compared with McLeod’s affidavit, to destroy all color for saying the case is within that condition or those limits. The Caroline was not in the act of making an assault on the Canada shore ; she was not in a condition to make one; she had returned from her visit to Navy Island, and was moored in our own waters for the night. Instead of meeting her at the line and repelling force by force, the prisoner and his associates came out under orders to seek her wherever [ *587 ] *they could find her, and were in fact obliged to sail half the width of the Niagara river, after they had entered our territory, in order to reach the boat. They were the assailants; and their attack might have been legally repelled by Durfee even to the destruction of their lives. The case made by the affidavit is in principle this : a man believes that his neighbor is preparing to do him a. personal injury. He goes half a mile to his house, breaks the door and kills him in his bed at midnight. On being arraigned, he cites the law of nature; and tells us that he was attacked by his neighbor, and slew him on the principle of mere defence and prevention ; or, in the language of the plea of son assault demesne— “ he made an assault upon me, and would then and there have beat me, had I not immediately defended myself against him ; wherefore I did then and there defend myself as I lawfully might for the cause aforesaid ; and in doing so, did necessarily and unavoidably beat him, doing him on such occasion no unnecessary damage. And if any damage happened, it was occasioned by his assault and my necessary defence.”
To excuse homicide in self-defence, says another English writer, the act must not be premeditated. He must first retreat as far as he safely can, to avoid the violence threatened by the party whom he is obliged to kill. The *449 retreat must be with an honest intention to escape ; and he must flee as far as he conveniently can by reason of some impediment, or as far as the fierceness of the assault will permit him, and then in his defence, he may kill his adversary.” 1 Russ, on Cr. 544.
Such is the law of mixed war, on neutral ground. The books cited are treating of no narrow technical rule peculiar to the common law ; but the law of nature and of nations, the same everywhere, of such paramount force as no municipal or international law could ever overcome ; and intelligible to every living soul. It is easily applied both as between individuals in civil society and nations at peace. Passing' the boundary of strict, not fancied necessity, the remedy lies in suit by the state or citizen whose rights have been violated, or by demanding the person of the mischievous fugitive *who has broken the criminal law of a for- [ *588 ] eign sovereign. Accordingly, Puffendorf, after considering the rights of private war in a state of nature, adds: “ But we must by no means allow an equal liberty to the members of civil states. For here, if the adversary be a foreigner, we may resist and repel him any way at the instant when he comes violently upon us. But we cannot, without the sovereign’s command, either assault him whilst his mischief is only in machination, or revenge ourselves upon him after he has performed the injury against us.” Puff. B. 2, ch. 5, § 7. The sovereign’s command must, as we have seen, in order to warrant such conduct in his subject, be a denunciation of war.
England, then, could legally impart no protection to her subjects concerned in the destruction of the Caroline, either as a party to any war, to any act of public jurisdiction exercised by way of defence, or sending her servants into a territory at peace. That her act was one of mere arbitrary usurpation was not denied on the argument, nor has this, that I am aware, been denied by any one except England herself. I should not, therefore, have examined the nature of the transaction to any considerable extent, had it not been necessary to see whether it was of a character belonging to the law of war or peace. I am entirely satisfied it belongs to the latter; that there is nothing in the case except a body of men, without color of authority, bearing muskets and doing the deed of arson and death; that it is impossible even for diplomatic ingenuity to make it a case of legitimate war, or to show that it can plausibly claim to come within any law of war, public, private, or mixed. Even the British minister is too just to call it war ; the British government do not pretend it was war.
The result is that the fitting out of the expedition was an unwarrantable act of jurisdiction exercised by the provincial government of Canada over our citizens. The movements of the boat had been watched by the Canadian authorities from the opposite shore. She had been seen to visit Navy Island the day before. Those authorities, being convinced of her delin *450 z quency, sentenced her to be burned : an act which all concerned [ *589 } knew would seriously endanger the *lives of our citizens. The sentence was, therefore, equivalent to a judgment of death; and a body of soldiers were sent to do the office of executioners.
Looking at the case independently of British power, no one could hesitate in assigning the proper character to such a transaction. The parties concerned having acted entirely beyond their territorial or magisterial power, are treated by the law as individuals proceeding on their own responsibility. If they have burned, it is arson; if a man has been killed, it is murder..
This brings us to the great question in the cause. We have seen that a capital offence was committed within our territory in time of peace ; and the remaining inquiry is whether England has placed the offenders above the law, and beyond our jurisdiction, by adopting and approving such a crime. It is due to her, in the first place to deny that it has been so adopted and approved. She has approved a public act of legitimate defence only. She cannot change the nature of things. She cannot turn that into lawful war which was murder in time of peace. She may, in that way, justify the offender as between him and his own government. She cannot bind foreign courts of justice by insisting that what in the eye of the whole world was a deliberate and prepared attack, must be protected by the law of self defence.
In the second place, I deny that she can, in time of peace, send her men into our territory, and render them impervious to our laws, by embodying them and putting arms in their hands. She may declare war; but if she claim the benefit of peace, as both nations have done in this instance, the moment any of her citizens enter our territory, they are as completely obnoxious to punishment by our law, as if they had been born and always resided in this country.
I will not, therefore, dispute the construction which counsel put upon the language or the acts of England. To test the law of the transaction, I will concede that she had, by act of parliament, conferred all the power which can be contended for in behalf of the Canadian authorities, as far as she could do so: that, reciting the danger from piratical steam boats, she £ *590 3 had authorized any colonel of her army or *militia, on suspecting - that a boat lying in our waters intended illegally to assault the Can- • adian shore, to send a file of soldiers in the day or night time, burn the boat and destroy the lives of the crew : that such a statute should be exeóuted ; but, that one of the soldiers failing to make his escape, should be arrested, and plead the act of parliament. Such an act would operate well, I admit, at Chippewa, and until the men had reached the thread of the Niagara river. It would be an impenetrable shield till they should cross the line of that country where parliament have jurisdiction. Beyond, I need not say it must be considered as waste paper. Even a subsequent statute, ratifying and *451 approving the original authority, could add nothing to the protection proffered by the first. It would be but the junction of two nullities. So says Mr. Locke, (on Gov. B. 2, ch. 19, § 239) of a Icing, even in his own dominions: “ In whatsoever he has no authority, there he is no king, and may be resisted ; for wheresoever the authority ceases, the king ceases too, and becomes like other men who have no authority.” I shall not cite books to show that the queen of England has no authority in this state in a time of peace.
I will suppose a stronger case ; that England being at war with Franco, should, by statute or by order of the queen, authorize her soldiery to enter our territory and make war upon such French residents as might be plotting any mischief against her. Could one of her soldiers, indicted for the murder of a French citizen, plead such a statute or order in bar ? If he could not as against a stranger and sojourner in our land, I need not inquire whether the same measure of protection be due to Durfee, our fellow citizen.
“ The laws of no nation,” says Mr. Justice Story, “ can justly extend beyond its own territories, except so far as regards its own citizens. They can have no force to control the sovereignty or rights of any other nation within its own jurisdiction. It would be monstrous to suppose that our revenue officers were authorized to enter into foreign ports and territories, for the purpose of seizing vessels which had offended against our laws.” The Apollon, 9 Wheat. Rep. 362, 371,2. He has examined the question at large in his *book on the Conflict of Laws, ch. 2, § 17 to [ *591 ] 22, p. 19,2d ed. The result is, that no nation is bound to respect the laws or executive acts of any foreign government intended to control or protect its citizens while temporarily or permanently out of thei.i own country, until it first declare war. Its citizens are then subject to the laws of war. Till that comes, they are absolutely bound by the laws of peace. While this prevails, a foreign executive declaration, saying, “ My subject has offended against your criminal laws. I avow his act. Punish me, but impute nothing to him,” is a nullity. As well might a nation send a company of soldiers to contract debts here, and forbid them to be sued, saying, “ The debt was on my account; discharge my men, and charge it over against me !” Indeed it was even urged on the argument that the letter of Mr. Fox had taken away the remedy of Wells, the boat owner, by an action of trespass against McLeod for burning the boat. This action having, it seems, been settled, counsel resorted to it as an illustrative case. Another action, brought against him for shooting a horse on the same occasion, it was said is also defeated by the same principle. Counsel spoke as if Schlosser had undergone a sack, and its booty had become matter of belligerent right in the soldiery. Surely, the imaginations of counsel must have been heated. It seems necessary to remind them again and again, even in affirmance of their own admission, that we are sitting to administer the laws of a country *452 which was at peace with England when she sent in her soldiery. If they mean that the appoval and demand in Mr. Fox’s letter should, under the law of peace, have the sweeping effect which is claimed for it, they are bound to show that the royal mandate improves by importation. The queen has no power at home to take away or suspend, for a moment, the jurisdiction of her own courts. Nor would a command to discharge any man without trial, who should be suspected of having murdered her meanest subject, be deemed a venial error. It is justly a source of the Briton’s pride that the law by which his life and property are protected, cannot be suspended even by his monarch ; that the sword of justice is holden by her [ *592 ] own independent ministers, as a defence for those who do *well; but constantly threatening, and ready to descend upon the violator of property or personal safety, as the instrument of a municipal law xyhich knows not of any distinction between the throne and the cottage ; a law constantly struggling, in theory at least, to attain a perfection that shall bring all on earth to do it reverence ; “ the greatest as fearing its power, and the least as not unworthy of its care.”
Much was said on the argument about the extreme hardship of treating soldiers as criminals, who, it was insisted, are obliged to obey their sovereign. The rule is the same in respect to the soldier, as it is with regard to any other agent who is bound to obey the process or command of his superior. A sheriff is obliged to execute a man who is regularly sentenced to capital execution in this state. But should he execute a man in Canada, under such sentence, he would be a murderer. A soldier, in time of war between us and England, might be compelled, by an order from our government, to enter Canada and fight against and kill her soldiers. But should congress pass a statute compelling him to do so on any imaginable exigency, or under any penalty, in time of peace, if he should obey and kill a man, he would be guilty of murder. The mistake, is in supposing that a sovereign can compel a man to go into a neighboring country, whether in peace or war, and do a deed of infamy. This is exemplified in the case of spies. A sovereign may solicit and bribe, but he cannot command. A thousand commands would not save the neck of a spy should he be caught in the camp of the enemy. Vattel, B. 3, ch. 10, § 179. It is a mistake to suppose that a soldier is bound to do any act contrary to the law of nature, at the bidding of his prince. Vattel, B. 1, ch. 4, § 53-4; id. B. 3, ch. 2, § 15. Grot. B. 2, ch, 26, § 3, N. 2 and 3. Puff. B. 8, ch. 1, § 6—7. But if he were, he must endure the evil of living under a sovereign who will issue such commands. It docs not follow that neighboring countries must submit to be infested with incendiaries and assassins, because men are obnoxious to to punishment in their own country, for being desirous to go through life *453 with bloodless hands and a quiet conscience. The Parisians thought themselves bound to obey Charles IX. *when he ordered [ *593 ] them to Massacre the Huguenots. Suppose they had obeyed a similar order to massacre the Huguenots in England, would such an order have been deemed a valid plea, on one of them being arraigned in the queen’s bench ? It might have been pleaded to an accusation of murder in France —it would have been good as between the criminal and his own sovereign ; but hardly, I suspect, have been deemed so by Queen Elizabeth’s Judges. The simple reason would have been, that Charles IX. had no jurisdiction in England. He might have threatened the government and declared war, if such a meritorious servant, a defender of the church, should not be liberated by the judges. But there is no legal principle on which the decrees of foreign courts, or the legislator of foreign parliaments, could have ousted the judges of jurisdiction. Charles might have ordered his minister to call the massacre a public act, planned and executed by himself, he having authority to defend and protect his established church; and demanded a release of the man. All this would have added no force to the plea. ¡Neither Elizabeth herself, nor any of the Tudors, abitrary as the government of England was, would have had power directly to take away the jurisdiction of the judges. Coke, with a law book in his hand, could have baffled the sceptre within its own territorial jurisdiction. It should, in justice, be remarked, that Orte, the governor of Bayonne, and many of his companions in arms, refused to co-operate in the massacre at home, and were never punished for disobedience. He replied, to the king, that he had sounded his garrison, and found many brave soldiers among them, but not a single executioner. Suppose a prince should command a soldier to commit adultery, incest or perjury; the prince goes beyond his constitutional power, and has no more right to expect obedience than a corporal who should summarily issue his warrant for the execution of a soldier. Vid. Burl. L. of Nature, vol. 1, pt. 2, ch, 11, § 8.
Every political and civil power has its legal limits. The autocrat may indeed take the lives of his own subjects, for disobeying the most arbitrary commands; but even his behests cannot impart protection to the merest slave as against *a foreign government. Public war itself [ *594 ] has its jurisdictional limits. Even that, in its pursuit after a flying enemy is, we have seen, arrested by the line of a country at peace. Beside the limit which territory thus imposes, there are also, even in general war-, other jurisdictional restraints, as there are in courts of justice. An order emanating from one of the hostile sovereigns will not justify to the other, every kind of perfidy. The case of spies has been already mentioned. An emissary sent into a camp with orders to corrupt the adverse general, or bribe the sodilery, would stand justified to his immediate sovereign. Vattel, B. 3, ch. 10, § 180; though even he could not legally punish a refusal. In *454 respect to the enemy, orders would be an obvious excess of jurisdiction. The emissaries sent by Sir Henry Clinton, in 1781, to seduce the soldiers of the Pennsylvania line, falling into the hands of the Americans, were condemned and immediately executed. 4 Marsh. Life of Wash. 366, 1st. ed. Entering the adverse camp to receive the treacherous propositions of the genez-al is an offence much more venial. It is even called lawful in every sense, as between the sovereign and employee. Vattel, B. 3, ch. 10, § 181. Yet, in the case of Major Andre, an order to do so was, as between the two hostile countries, held to be an excess of jurisdiction.
These cases are much stronger than any which can be supposed between nations at peace. In time of war such perfidy is expected. In time of peace, every citizen, while within [his own territory, has a double ground for supposing himself secure ; the legal inviolability of that territory, and the solemn pledge of the foreign sovereignty.
The distinction, that an act valid as to one may be void as to another, is entirely familiar. Aman who orders another to commit a trespass, or appro ves of a trespass already committed for his benefit, may be bound to protect his servant, while it would take nothing from the liability of the servant to the party injured. As to him, it could merely have the effect of adding another defendant, who might bo made jointly or severally liable with the actual wrong doer. A case in point is mentioned by Vattel, B. 3, ch. 2, § 15. If one sovereign order his recruiting officer to make enlistments [ *595 ] *in the dominion of another in time of peace between them, the officer shall be hanged, notwithstanding the order, and war may also be declared against the offending sovoreign. Vide a like instance, Id. B. 1, ch. 6, § 75.
What is the utmost legal effect of a foreign sovereign, approving of the crime which his subject has committed in a neighboring territory ? The approval, as we have already in part seen, can take nothing from the criminality of the principal offender. Whatever obligation his nation may be under to save him harmless, this can be done only on the condition that he confine himself within her territory. Vattel, B. 2, ch. 6, § 74. Then, by refusing to make satisfaction, to punish, or to deliver him up, on demand, from the injured country, or by approving the offence, the nation, says Vattel, becomes an accomplice. Id. § 76. Blackstone says, an accomplice or abettor. 4 Com. 68; and Rutherforth, still more nearly in the language of the English law, an accessory after the fact. B. 2, ch. 9, § 12. No book supposes that such an act merges the original offence, or renders it imputable to the nation alone. The only exception lies in the case of a crime committed by an ambassador; not because he is guiltless, but by reason of the necessity that he should be privileged, and the extraterritorial character, which the law of nations has, therefore, attached to his *455 person. Hence, say the hooks, he can be proceeded against no otherwise than by a complaint to his own nation, which will make itself a party in his crime, if it refuse either to punish him by its authority, or to deliver him up, to be punished by the offended nation. Ruth. B. 2, ch. 9, § 20. Independently of this exception, therefore, Rutherforth insists, with entire accuracy, that1 c as far as we concur in what another man does, so far the act is our own; and the effects of it are chargeable upon us as well as upon him.” Ruth. B. 1, ch. 17, § 6. A nation is but a moral entity ; and in the nature of things, can no more wipe out the offence of another by adopting it, than could a natural person. And the learned writer just cited, accordingly treats both cases as standing on the same principle. B. 2, ch. 9 § 12. “ Nothing is more usual,” says Puffendorf, “ than that every particular accomplice in a *crime, be made to suffer all [ *596 ] that the law inflicts.” B. 3, ch. 1, § 5. Yattel says of such a case, B. 2, ch. 6, § 75, if the offended state have the offender in her power, she may, without scruple, punish him. Again, if he have escaped and returned to his own country, she may apply for justice to his sovereign, who ought, under some circumstances, to deliver him up. Id. § 76. Again, he says, she may take satisfaction for the offence herself, when she meets with the delinquent in her own territories.” B. 4, ch. 4, § 52. I before cited two instances in which positive orders by his sovereign to commit a crime are distinctly held to render both the nation and its subject obnoxious to punishment. Vattel, B. 3, ch. 2, § 15. Id. B. 1, ch. 6, § 75. Vide also 1 Burl. pt. 2, ch. 11, § 10.
Was it ever suggested by any one before the case of McLeod arose, that the approval by a monarch should oust civil jurisdiction, or even so much as mitigate the criminal offence ; nay, that the coalition of great power with great crime does not render it more dangerous, and therefore more worthy of punishment under every law by which the perpetrator can be reached ?
Could approbation and avowal have saved the unhappy Mary Queen of Scots, where would have been the civil jurisdiction of Elizabeth’s commissioners ? The very charge of an attempt by Mary to dethrone and assassinate the British Queen, implied the approbation and active concurrence of one crowned head at least. Could the criminal have been saved by any such considerations, the enterprize might truly have been avowed as one which had been planned by the leading governments of Catholic Europe.
The Pope then, having at least some pretensions to jurisdiction, even in England, had openly approved it under his seal. The Spanish ambassador at Paris was a party relied upon to follow up the event with an invasion. Would James, the son of the accused, have hesitated to join in the avowal, could he have thus been instrumental in saving the life of his mother ? *456 Yet the principle was not thought of, in the whole course of that extra. ordinary affair. Mary ' openly avowed her general treason as a [ *597 ] measure of defence and protection to herself, though she denied all participation in the plot to assassinate Elizabeth. Yet the only ground taken was, the technical one (not the less valid because techni. cal) that the accused was personally privileged as a monarch, and could not be tried under the English law, which required a jury composed of her peers. It was added, that she came into the kingdom under the law of nations, and had enjoyed no protection from the English law, having been continually kept as a prisoner. Vide the case stated and examined in the light of international law, 2 Ward's Law of Nations, 564. Ho one pretended that her approbation, or that of a thousand monarchs, could have reflected any degree of exemption from judicial cognizance, upon the alien servants in her employment. Such a principle would have filled England with an army, in time of peace, disguised as Jesuits; for the bigotry of monarchs would, at that day, have led them to avow any system of pernicious espionage which could have served the purposes of the Pope by executing his bull of excommunication against Elizabeth.
Canada again being disturbed, and our citizens aiding the revolt, by boats, provisions or money, the purposes of England would certainly require such conduct to be put down, at all events. Adopt the principle that she may, by avowal, protect her soldiery who steal upon our citizens at midnight from all punishment at the common law, and before you could get even a remonstrance from Washington, your whole frontier might be made a tabula rasa. Ho. Before England can lawfully send a single soldier for hostile purposes, she must assume the responsibility of public war.
Her own interests demanding the application of the rule, she perfectly understands its force. What regard have her courts ever paid to the voice of public authority on this side the line, when it sought to cover even territory to which the Uunited States denies her title ? The mere act of taking a census in the disputed territory under the authority of Maine, was severely punished by the English municipal magistrates. Had a posse of constables, or a company of militia bearing muskets been sent to aid the censor, in what book, or in what usage, could she have found that this would divest her courts *of jurisdiction, and put the cabinet of [ *598 ] St.’ James to a remedy by remonstrance, or war ? Had the posse been arrested by her sheriff, and in mere defence had killed him, this nation had, after some two or three years, avowed the act, would she have thought of conceding that in the mean time, all power of her courts over the homicides that had been suspended or finally withdrawn ?
But it is said of the case at bar, here is more than a mere approval by the adverse government, that an explanation has been demanded by the secreta *457 ry of state; and the British ambassador has insisted on McLeod’s release, and counsel claim for the joint diplomacy of the United States and England some such effect upon the power of this court as a certiorari from us would have upon a county court of general sessions. It was spoken of as incompatible with a judicial proceeding against McLeod in this state ; as a suit actually pending between two nations, wherein the action of the general government comes in collision with, and supersedes our own.
To such an objection the answer is quite obvious. Diplomacy is not a judicial, but executive function; and the objection would come with the same force whether it were urged against proceeding in a court of this state, or the United States. Whether an actual exertion of the treaty making power, by the President and Senate, or any power delegated to congress by the federal constitution, could work the consequences contended for, we are not called upon to inquire : whether the executive of the nation, (supposing the case to belong to the national court,) or the executive of this state might not pardon the prisoner, or direct a nolle prosequi to be entered, are considerations with which we have nothing to do.
The exclusive power is a constitutional department in this, as in every well organized government, entirely distinct from the judicial. And that would be so, were the national government blotted out, and the state of Hew-York left to take its place as an independent nation.
Hot only are our constitutions entirely explicit in leaving the trial of crimes exclusively in the hands of the judiciary : *but [ *599 ] neither in the nature of things, nor in sound policy, can it be confided to the executive power. That can never act upon the individual offender; but only by requisition on the foreign government; and in the instance before us, it has no power even to enquire whether it be true that McLeod has personally violated the criminal laws of this state. It has charge of the question in its national aspect only. It must rely on accidental information, and may place the whole question on diplomatic considerations. These may be entirely wide either of the fact or the law as it stands between this state and the accused. The whole may turn on questions of national honor, national strength, the comparative value of national intercourse, or even a point of etiquette.
Upon the principle contended for, every accusation which has been drawn in question by the executive power of two nations, can be adjusted by nego. tiation or war only. The individual accused must go free, no matter to what extent his case may have been misapprehended by either power. Ho matter how criminal he may have been, if his country, though acting on false representations of the case, may have been led to approve of the,transaction and negotiate concerning it, the demands of criminal justice are at an end.
*458 Under circumstances the executive power might, in the exercise of its discretion, be bound to disregard a venial offence as no breach of treaty which the judiciary would be obliged to punish as a breach of international law. Suppose some of our citizens to attack the British power in Canada, and the Queen’s soldiers to follow the heat of.repelling them by crossing the line and arresting the offenders, doing no damage to any one actually engaged in the conflict. The line being absolutely impassable in law for hostile purposes, the arrest on this side would be a technical false imprisonment, for which we should be bound to convict the soldiers, if arrested here; while the executive power might overlook the intrusion as an accidental and innocent violation of national territory. Vattel, B. 4, ch. 4, § 43.
I forbear now to notice particularly some of the legal passages and cases which were referred to by the prisoner’s counsel in the course of [ *600 ] the argument; not,for the reason *that I have omitted to examine them, but because I consider them inapplicable under the views I have felt it my duty to take of the prisoner’s case. They were principally of three classes: First, passages from books on’the law of nations as to what is public war, and the protection due to soldiers while engaged in the prosecution of such a war by their sovereign against a public enemy ; secondly, the general obligations of obedience as between him and his sovereign, whether in peace or war; and thirdly, cases from our own books relative to the conflicting powers of the general and state governments. The case of Elphinstone v. Bedreechund, 1 Knapp’s Rep. 316, related to the breach of an actual military stipulation entered into during an acknowledged public war between England and one of the petty sovereignties of India.
In considering the question of jurisdiction, I have also forborne to notice that branch of the affidavit which sets up an alibi. McLeod’s counsel very properly omitted to insist on it as at all strengthening the claim of privilege. Indeed they said the clause was put in merely by way of protestando. If it was inserted with the intention of having it taken as true upon this mo- . tion, that alone would destroy all pretence for any objection to our jurisdiction. His surrender was demanded upon the hypothesis that he was acting under public authority. If in truth he was not, or was not acting at all, he enjoys according to his own concession no greater privilege than any other man. The essential circumstance relied on as going to the question of jurisdiction, turns out to be fictitious ; and the argument must be that we have no power to try the question of alibi. On that and 'every other lawful ground of defénce he will be heard by counsel on his trial.
It is proper to add, that if the matters urged in argument could have any legal effect in favor of the prisoner, I should feel entirely clear that they would be of a nature available before the jury only. And that according to the settled rules of proceeding on habeas corpus, we should have no pow *459 er even to consider them as a ground for discharging the prisoner. I took occasion to show in the outset that in no view *can [ *601 ] the evidence for the prosecution or the defence be here examined, independently of the question of jurisdiction, and I entertain no doubt that whenever an indictment for a murder committed within our territory is found, and the accused is arrested, these circumstances give complete jurisdiction.
I know it is said by the English books, that even in a case of mixed war, viz. a hostile invasion of England by private persons, the common law courts have no jurisdiction. It was so held in Perkin Warbeck’s case. He was punished with death by sentence of the constable and marshall, who it is said in Calvin’s case, 7 Co. Rep. 11, 12, had exclusive jurisdiction. Vide Dy. 142, a. 1 Curw. Hawk. ch. 2, § 6, p. 9. But that rests on a distribution of judicial power entirely unknown to this state or this nation. The court of the constable and marshall seems to have had an ancient right not very well defined by the common law, of trying all military offences, as appears by the Stat. R. 2, vid. 2 Pick. St. at Large,p. 310, which was passed to settle conflicting claims of jurisdiction between that and the ordinary courts / vid. also 3 Inst. 48. The whole is obviously inapplicable to this country; and I suspect pretty much obsolete in England. It never can have been held in England or any country, that where a common law court is proceeding on an indictment for a common law offence against one arrested and brought before it, a mere suggestion by affidavit that the offence imputed pertains to deeds of arms, either in a public or mixed war shall take away power to try whether the prisoner be guilty or not of the charge contained in the indictment.
All homicide is presumed to be malicious, and, therefore, murder, until the contrary appear upon evidence. “ The matter of fact,” says Foster, “ viz. whether the facts alleged, by way of justification, excuse or alleviation are true, is the proper and only province of the jury,” Post. 255. Lawful defence by an individual, (still recognized it seems by the law of nature under the name of private war, (Grot. B. 1, ch. 3, § 2,) is one instance. Poster, 273. That he acted in right of a nation, or under public authority, is no more than matter of justification. It is like the case mentioned in Poster, 295 ; *the public execution of malefactors; and [ *602 ] the jury must judge whether the authority may not have been exceeded. But more, when public or mixed war is alleged in mitigation, either allegation may be fictitious ; and it should be put to the jury, on the proper evidence, whether it existed or not. The reason is plain, says Lord Hale ; for the war may be begun by the foreign prince only, where it is public ; and he supposes it still plainer where the war is between the king and an invading alien being the subject of a nation with whom the king is at peace. 1 Hal. P. C. 193,4. The same writer puts the case of plunder or robbery *460 by an enemy, tempus belli, which would not in general be burglary. Yet he admits it might be otherwise if the act were not done in the regular prosecution of the war, Id. 565.
Suppose a prisoner of war to escape, and that on his way home, and before he crossed the line, he should set fire to a farm house in the night and kill the inmates; is there a doubt that he might properly be convicted either of arson or murder ? When a grand jury have charged that a man has committed murder within this state, 1 can imagine no case, whether the charge relate to the time of open public war or peace, in which he can claim exemption from trial. If he show that he was in truth acting as a soldier in time of public war, the jury will acquit him. The judge wili direct them to obey the law of nations, which is undoubtedly a part of the common law. So if the accused were acting in defence against an individual invader of his country. But above all things is it important in the latter case, for the jury to inquire whether his allegation of defence be not false or colorable. They cannot allow as an act of defence, the wilful pursuing even such an enemy, though dictated by sovereign authority into a country at peace with the sovereign of the accused, seeking out that enemy and taking his life. Such a deed can be nothing but an act of vengeance. It can be nothing but a violation of the municipal law, the faith of treaties, and the law of nations. The government of the accused may approve, diplomacy may gloze, but a jury can only inquire whether he was a party to the deed, or to [ *603 ] any act of illegal violence which he knew *would probably endanger human life. If satisfied that he was not, as I sincerely hope they maybe, upon the evidence in the case before us, they will then have the pleasant duty to perform of pronouncing him not guilty. But whatever may be their conclusion, we feel the utmost. confidence that the prisoner, though a foreigner, will have no just cause to complain that he has suffered wrong at the hands of an American jury.
At cur hands the prisoner has a right to require an answer upon the facts presented by his papers, whether in law he can properly be holden to a trial. We have had no choice but to examine and pronounce upon the legal character of those facts, in order to satisfy ourselves of the bearing they might have on the novel and important question submitted. That examination has led to the conclusion that we have no power to discharge the prisoner.
He must, therefore, be remanded, to take his trial in the ordinary forms of law-*

 See the case in Cunningham’s Rep. 96, 2d ed. printed in 1770.

 The venue was changed in this case to the county of Oneida, at the oyer and terminer in which county the prisoner was tried in October, 1841. He proved an alibi, and was acquitted.